IN RE BLACKBURN'S ESTATE.    BLACKBURN, APPELLANT,
v. BLACKBURN ET AL., RESPONDENTS.

(No. 3,280.)

(Submitted October 20, 1913.    Decided November 1, 1913.)

[137 Pac. 381.]

*Administrators—Husband and Wife—Right to Nominate—
Waiver—Effect—Removal—Evidence—Pleadings—Discretion.*

Administrators—Right to Nominate—Waiver—Effect.
  1.  The prior right conferred by section 7432, Revised Codes, upon those
  most interested in an intestate's estate to administer it may be waived;
  and if waived in favor of another, the renunciation, if fairly procured
  and freely made, is irrevocable.
Same—Husband and Wife—Rights of Widow.
  2.  It is the policy of the law that the widow shall control *in limine*
  the administration of her late husband's estate, and to that end she
  may either administer it herself or nominate some competent person
  in whom she places trust and confidence.
    [As to the right of a widow to administer the estate of her de-
  ceased husband, see note in 93 Am. Dec. 685.]
Same—Right of Widow—Competency.
  3.  An assertion of claim to property which the other heirs contend
  belongs to the estate does not render the widow or her nominee in-
  competent to administer it.
Same—Nomination by Widow—Waiver—When not Irrevocable.
  4.  Denial of the petition of a widow for the revocation of letters of
  administration upon the estate of her husband theretofore issued to
  her stepson at her request, *held*, error where the waiver of her right
  to administer it herself had not been fairly procured or freely given.
Same—Removal—Pleadings—Sufficiency.
  5.  In a proceeding in which one primarily entitled to the administra-
  tion of an estate seeks the revocation of letters issued to his nominee,
  a strict technical observance of the rules of pleading in the preparation
  of the complaint was not required, it appearing at the hearing that
  defendant was not taken by surprise but was fully informed of the
  nature and scope of the charges made.
Same—Removal—Discretion.
  6.  Where there is no room for discretion in the district court none
  may be exercised; hence where the renunciation of her prior right to
  administer the estate of her late husband had not been fairly procured
  from the widow, her statutory right had not been exhausted, and it was
  not within the discretionary power of the court to deny her the exercise
  of it.
Same—Removal—Insufficient Grounds.
  7.  Alleged failure by an administrator to include a gold watch and a
  pair of field-glasses in his inventory of an estate valued at about
  $35,000 constituted no valid ground for his removal, where subsequent
  to the petition for revocation of his letters he filed a supplemental in-
  ventory including such articles.
    [As to grounds for the removal of an executor or administrator, see
  note in 138 Am. St. Rep. 525.]

Same—Incompetency—Right of Nomination.

8. A person primarily entitled to administer an estate but rendered incompetent by a want of understanding or integrity is not thereby deprived of the right to nominate someone to act in his stead.

*Appeal from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

IN THE MATTER of the estate of Gideon E. Blackburn, deceased. Petition by Hannah A. Blackburn for the removal of Chas. A. Blackburn, as administrator of said estate. From an order dismissing the proceeding, petitioner appeals. Reversed and remanded.

*Messrs. Nolan & Donovan,* for Appellant, submitted a brief; *Mr. Timothy F. Nolan* argued the cause orally.

The contention of appellant briefly is that section 7450, Revised Codes, carries its own interpretation. It is neither ambiguous nor uncertain. The right of a surviving wife to have letters issued to her and letters issued to any other person revoked is not qualified by any condition, and is not narrowed by any exception. This right is absolute. It is obvious that the question of her right to have letters issued to her nominee revoked can never arise except in the case where she has nominated. Therefore, if argument be made that she has waived her right to letters by nominating another, the statute is made to mean something else than what plain words make it mean. The statute would then be made to read that a surviving wife, when letters of administration have been granted to a child, father, brother or sister, may assert her prior right and obtain letters of administration and have letters before granted revoked, except in a case where she has requested the court to appoint one of those persons named and that person has been appointed. This interpretation of the statute takes from a person an absolute right given by the legislature, and substitutes therefor a qualified right. The California cases which were relied on in the court below as a so-called estoppel of the appellant, are *In re Estate of Moore,* 68 Cal. 281, 9 Pac. 164; *Estate of Keane,* 56

Cal. 407; *Estate of Kirtlan,* 16 Cal. 161; *In re Silvar's Estate,* 5 Cal. Unrep. 494, 46 Pac. 296; *Estate of Bedell,* 97 Cal. 339, 32 Pac. 323.    None of the cases is in point, because in none of them was the applicant proceeding under a section similar to our section 7450, nor is the reason adopted by the supreme court of California in these cases applicable to the case at bar.    The conclusion in each of the first three is based purely upon the ground of estoppel, because the petitioner had incurred expense upon the filing of the nomination, and in each case the nominee was left in a position where no reimbursement could be had from the estate that he was nominated to administer.    In this case the reason for estoppel does not exist, there being no question of the right of the administrator to be reimbursed, nor any evidence that prior or preferred claims of appellant or any other person will preclude him from being reimbursed for his expense.    The last two cases cited above are based upon the *Kirtlan Case,* and rest upon estoppel.    In a later case—*Estate of Shiels,* 120 Cal. 347, 52 Pac. 808—all of these cases appear to have been completely overruled, it being there held that a widow may revoke her request before the same is acted upon by the court.

Appellant in asking for the revocation of letters and the issuance of letters to her was and is exercising a right granted by statute.    This right is property, and the owner is entitled to use it to the exclusion of others.    Her motives may not be inquired into, and cannot affect the merits of this action.    (*Bordeaux* v. *Greene,* 22 Mont. 254, 74 Am. St. Rep. 600, 56 Pac. 218; *Mac-Ginniss* v. *Boston & Mont. etc. Min. Co.,* 29 Mont. 428, 75 Pac. 89.)    The statutes give the widow the first right to letters of administration.    (Sec. 7432, Rev. Codes.)    Letters are, therefore, never issued to a child unless the widow has waived her right by failure to apply for letters to herself or by nomination of some other person.    The only effect, therefore, of section 7450 is to give the widow the right to demand the administration of the estate even though by her inaction or her positive act she may have previously waived that right.    The question of her right under section 7450 can never arise until after there has been an

appointment. "It is the policy of the law that the widow shall have the control of the administration of her husband's estate." (*Dorris' Estate,* 93 Cal. 611, 29 Pac. 244; *Estate of Shiels, supra.*) "The law contemplates that those most interested in the administration of an estate shall have the right to nominate some person whom they deem trustworthy to act for them." (*In re Watson's Estate,* 31 Mont. 438, 78 Pac. 702.)

*Messrs. Wm. Wallace, Jr., John G. Brown* and *T. B. Weir,* for Respondent, Chas. A. Blackburn, Administrator, submitted a brief; *Mr. Brown* argued the cause orally.

"Appellate courts are not disposed to set aside an appointment regularly made by the probate judge, except where the latter has abused a wide discretion which the law confides to him." (*Bentley* v. *Jarrell,* 41 Ind. App. 586, 84 N. E. 548; *Brown* v. *Dunlap,* 70 Kan. 668, 79 Pac. 145; *In re Rice,* 158 Mich. 53, 122 N. W. 212; *State* v. *Romjue,* 136 Mo. App. 650, 118 S. W. 1188; *In re Scott,* 76 Neb. 28, 106 N. W. 1003, 107 N. W. 1004; *Davenport* v. *Davenport,* 68 N. J. Eq. 611, 6 Ann. Cas. 261, 60 Atl. 379; *Butcher* v. *Kunst,* 65 W. Va. 384, 64 S. E. 967.) The statute gives a preference to males over females. (Secs. 7433, 7434, Rev. Codes.) This statutory ruling is followed in many decisions which have also placed the preference with males upon the ground that courts prefer to have someone of business experience. Further, courts very properly try to avoid appointing claimants (even widows—*Davis' Estate,* 48 Misc. Rep. 489, 96 N. Y. Supp. 1106) whose interests are conflicting or apt to conflict with those of the estate. (*In re Rathgeb's Estate,* 125 Cal. 302, 57 Pac. 1010; *In re Wallace,* 68 App. Div. 649, 74 N. Y. Supp. 33; *Bauquier's Estate,* 88 Cal. 302, 26 Pac. 178, 532; *Putney* v. *Fletcher,* 148 Mass. 247, 19 N. E. 370; *Marks* v. *Coats,* 37 Or. 609, 62 Pac. 488; *Bean* v. *Pettengill,* 57 Or. 22, 109 Pac. 865; *In re Sharpless,* 209 Pa. 69, 57 Atl. 1128.)

It is also contended that hostility shown toward Hannah A. Blackburn by the administrator should entitle her to have him removed. An extended search has failed to disclose to us

a single case supporting this contention, and we have found numerous holding expressly to the contrary. (*Stevens* v. *Larwill,* 110 Mo. App. 140, 84 S. W. 113; *In re Waterman's Estate,* 112 App. Div. 313, 98 N. Y. Supp. 583; *In re Job's Estate,* 28 Pa. C. C. 336; *Rementer's Estate,* 28 Pa. C. C. 638; *Randle* v. *Carter,* 62 Ala. 95.)

Appellant having executed her waiver and the court having acted upon it, the waiver is complete and she is not entitled to administer the estate as against the administrator so designated and appointed. Statutory rights may be waived, and persons, upon well-defined principles of estoppel, are not allowed to blow first hot and then cold in their dealings with courts and the law. This doctrine has been recognized and enforced in decisions holding that a failure by one entitled to apply for letters of administration within a reasonable time is held as a waiver of the statutory right, and unless very good cause is shown, the application will be refused. (*In re Crites' Estate,* 155 Cal. 392, 101 Pac. 316; *McColgan* v. *Kenny,* 68 Md. 258, 11 Atl. 819; *Rodes* v. *Boyers,* 106 Tenn. 434, 61 S. W. 776; *Briggs* v. *Probate Court,* 23 R. I. 125, 50 Atl. 335 *Jewett* v. *Turner,* 172 Mass. 496, 52 N. E. 1082; *In re Sprague's Estate,* 125 Mich. 357, 84 N. W. 293; *Rice* v. *Tilton,* 13 Wyo. 420, 80 Pac. 828.)

Inventories are purely statutory and no permission of court is necessary. (Sec. 7493, Rev. Codes; *Texas Loan Agency* v. *Dingee,* 33 Tex. Civ. App. 118, 75 S. W. 866.) The statute expressly provides that further inventories may be filed, and makes no requirement of first obtaining leave to file. (Sec. 7500.) Now, when the reason for the rule ceases, the rule ceases. So it is in this case, when the inventory is filed and within proper time, the reason for removal on this ground ceases. (*Cosby* v. *Weaver,* 107 Ga. 761, 33 S. E. 656.) "The failure to file an inventory by the time specified amounts technically to an official delinquency, or breach of the condition of the administrator's bond, which may prove serious, but rarely can, if upon citation the executor or administrator performs his duty or shows good cause why an inventory should be deferred or dispensed with." (18

Cyc. 206.) It is all within the sound discretion of the court and revocation should be refused where sufficient excuse is offered, as was done here. (*Moore* v. *Mertz*, 38 Tex. Civ. App. 283, 85 S. W. 312; *Mulford* v. *Mulford* (N. J.), 53 Atl. 79; *Harris* v. *Seals*, 29 Ga. 585; *Andrews* v. *Carr*, 2 R. I. 117; *Dowdy* v. *Graham*, 42 Miss. 451.) So a supplemental statement describing the property omitted is sufficient though not filed as an inventory (*Ackerson* v. *Orchard*, 7 Wash. 377, 34 Pac. 1106, 35 Pac. 605) ; or where an inventory is actually filed as in the case here—and the estate does not lose thereby. (*Clancy* v. *McElroy*, 30 Wash. 567, 70 Pac. 1095; *Chadbourne's Estate*, 15 Cal. App. 363, 114 Pac. 1012.) In addition to the statutory authority we find that an inventory subsequently filed is valid. (*Phelan* v. *Smith*, 100 Cal. 158, 34 Pac. 667.)

*Messrs. Maury, Templeman & Davies* submitted a brief in behalf of Respondents other than the administrator; *Mr. H. L. Maury* argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Dr. Gideon E. Blackburn, of Butte, died intestate on March 24, 1912, leaving some estate, and surviving heirs as follows: Hannah A. Blackburn, his wife, Charles A. Blackburn, a son, and two daughters. On March 29, 1912, Charles A. Blackburn filed in the district court of Silver Bow county a petition for letters of administration of the estate, and also filed a writing signed by the widow, wherein she formally waived her right to such letters and requested his appointment. In the petition it is recited that the estate and effects in respect of which letters of administration are asked do not exceed the value of $5,000, and that it consists of office and household furniture, libraries, book accounts, and miscellaneous stocks and bonds of unknown value. The petition came on for hearing in due course, and at the hearing the petitioner testified that, so far as he then knew, the value of the estate was not to exceed $5,000; of this, $2,900 was cash, the remainder being stocks, bonds, and other interests.

The petition was granted, and Charles A. Blackburn has since acted as administrator. On June 5, 1912, he filed an inventory and appraisement, wherein he failed to list a gold watch and a pair of field-glasses as part of the estate, but did list as the property of said estate a large number of securities and various parcels of realty claimed by the widow as her individual property. By this inventory it was made to appear that the estate was of the value of $34,996.07. On June 7, 1912, the widow filed her petition, alleging, in substance, that the administrator had willfully and fraudulently failed and refused to list the watch and field-glasses above mentioned, and had converted the same to his own use, and that, with the intent to involve the estate in useless and unnecessary litigation, he had listed the securities and realty above referred to, belonging exclusively to her. On the following day the administrator filed a supplemental inventory, listing the watch, the glasses, a revolver, and an additional piece of real estate; so that, as finally presented by the two inventories, the appraised value of the estate is made to appear at $35,558.07.

To the petition of the widow two answers were filed: One by the administrator, and the other by H. L. Maury on behalf of Daisy I. O'Neill and Sister M. Florentia, the daughters of deceased; the answer of the daughters, praying "that no relief be granted to Mrs. Hannah A. Blackburn," denies generally the allegations of her petition, including her widowhood; denies that the watch and glasses are of any value; alleges that she is not related to them, and that their mother is still alive. The answer of the administrator puts in issue the widowhood of the petitioner; explains the omission of the watch and glasses from the first inventory; denies the charges of fraud, waste, or intent to involve the estate in unnecessary litigation, or that any litigation he will bring will be in bad faith; and alleges that any claim he may assert or attempt to enforce will be under the permission of the court, for the sole use and benefit of the estate. By way of further answer the administrator pleads the waiver and request executed by the widow, and alleges that in consequence thereof,

and of expenditures by him of money in the care of the estate, "she is not entitled to now assert any rights which she may have or claim, as widow, to have letters of administration issued to her."

In reply to the answer of the administrator, the widow admits the execution of the waiver and request filed March 29, 1912, and alleges that the same was made by her "upon the solicitations of Charles A. Blackburn and the advices of John G. Brown, his attorney, and the representations of friendliness on the part of the said Charles A. Blackburn" toward her, and that since the issuance of letters of administration to him, he has become and now is hostile to her and to the best interests of the estate "and dishonest and untrustworthy, as more fully appears from the petition herein on file." The matter was heard before the district court of Silver Bow county, the Honorable Jeremiah J. Lynch, judge presiding; and, upon the proceedings had, including the testimony taken, an order was made by which the petition of the widow was denied and the proceeding dismissed. From that order this appeal is taken.

The appellant contends that the petition should have been granted, because the widow is vested by the statute with a prior right to administer her late husband's estate, which cannot be affected by her renunciation; because the circumstances under which the administrator secured her renunciation were such that it ought not be held effective in view of his present attitude toward her interests, and because the evidence establishes that he is not a fit and proper person to have control of the estate.

1. The position that the widow is entitled, notwithstanding her renunciation and the appointment of her nominee, to have him removed and letters issued to her whenever she so elects, is grounded in the assumption that such is the unmistakable meaning of section 7450, Revised Codes. Notwithstanding the contention of appellant that this section is so clear as to be self-interpreting, its meaning cannot be ascertained from its language alone. Taken by itself—all collateral light excluded—we are without any information as to what right is recognized,

what the character of that right is, or how that right may be asserted; all we can know is that whatever the right and however claimed, it would be unavailing where letters have been issued to the mother, since she is not mentioned among those as against whom it may be asserted. Such a conclusion, so manifestly contrary to the general plan and purpose of the statute, is of course untenable; but it serves to show that, to give the statute any intelligible meaning, we are required to construe it in connection with other provisions to which it stands in obvious relation. When this is done, a result is reached different from that upon which the appellant insists.

"Administration of estate of all persons dying intestate must be granted to some one or more of the persons hereinafter mentioned, * * * in the following order: 1. The surviving husband or wife, or some competent person whom he or she may request to have appointed. 2. The children. 3. The father or mother. 4. The brothers. 5. The sisters. * * * " (Sec. 7432, Rev. Codes.) "Letters of administration must be granted to any applicant, though it appears that there are other persons having better rights to the administration, when such persons fail to appear and claim the issuance of letters to themselves" (sec. 7444); but when letters have been granted to any other person than the surviving spouse, child, parent, brother, or sister, "any one of them who is competent, or any competent person at the written request of any one of them, may obtain the revocation of the letters, and be entitled to the administration" by presenting to the court an appropriate petition (sec. 7447), on which a citation to the administrator shall issue (sec. 7448), and a hearing be had (sec. 7449). "The surviving husband or wife, when letters of administration have been granted to a child, father, brother or sister of the intestate; or any of such relatives, when letters have been granted to any other of them, may assert his prior right and obtain letters of administration and have letters before granted revoked in the same manner prescribed in the three preceding sections." (Sec. 7450.) The primary purpose of these provisions is, of course, to confer a

prior right of administration upon those most interested in the estate, to signify the legislative will concerning the order of priority, to provide a method by which it may be once asserted in every case, and to authorize its assertion by nomination in certain instances.   There is no warrant for the inference that the legislature intended the right to continue after it had been once freely exercised; for, valuable though it is, the advantage conferred is solely for the benefit of the persons named, and involves no public purpose.   It may therefore be waived (sec. 6181, Rev. Codes), and the effect of its waiver cannot be different from the effect of a waiver in other cases.   This result, derived from our statutory provisions alone, is supported by an abundance of authority, and compels us to hold that if the renunciation and request of appellant, because of which the administrator was appointed, was fairly procured and freely given, she has exercised her prior right, and no longer has any to assert.   (*In re Estate of Moore,* 68 Cal. 281, 9 Pac. 164; *Slay* v. *Beck,* 107 Md. 357, 68 Atl. 573; *Estate of Keane,* 56 Cal. 407; *In re Evans' Estate,* 117 Mo. App. 629, 93 S. W. 922; *Estate of Wooten,* 56 Cal. 322; *Stocksdale* v. *Conaway,* 14 Md. 99, 74 Am. Dec. 515; *In re Bedell's Estate,* 97 Cal. 339, 32 Pac. 323; *Estate of Kirtlan,* 16 Cal. 161.)·

2. It is, however, the policy of our law that the widow shall [2] control *in limine* the administration of her late husband's estate.   (*Shiels' Estate,* 120 Cal. 347, 52 Pac. 808; *Dorris' Estate,* 93 Cal. 611, 29 Pac. 244.)   To that end she is authorized to either administer it herself, or to nominate some person in whom she places trust and confidence to administer it for her. (*In re Watson's Estate,* 31 Mont. 438, 78 Pac. 702.)   No condition or limitation is imposed upon her choice save that she or [3] the person she nominates be competent; nor does the fact that she asserts claim to property which the other heirs contend belongs to the estate render her or her nominee incompetent. (Rev. Codes, sec. 7436; *Rice* v. *Tilton,* 13 Wyo. 420, 80 Pac. 828; *Brundage's Estate,* 141 Cal. 538, 75 Pac. 175; *Estate of Bauquier,* 88 Cal. 302, 26 Pac. 178, 532.)   In the instant case, considerations touching the burden of proof in any action affecting

the title to the disputed property might easily render the attitude of the administrator a matter of grave importance to the widow; and she was entitled to retain, until lost by her voluntary act, such legitimate advantage as might arise from her right to control the administration. Therefore, her due was absolute frankness on the part of the person seeking her nomination; and if he, pending her assent to his appointment, so demeaned himself as to deceive or lull her into a false security concerning his attitude, and she, believing him friendly to her and not hostile to her claims, waived her right and assented to his appointment to her disadvantage, it cannot be said that her waiver was fairly procured or freely given.

The voluminous record before us tends to show that the claim asserted by the widow to certain stocks, bonds, and real estate which were not mentioned in the petition for letters, but which have been listed in the inventory, is not wholly baseless. The evidence bearing upon the attitude of the administrator [4] toward her and her claims comes entirely from her and from him. Prior to his appointment, she says, he had been kind and affectionate to her, and she was depending upon him. On the day after the funeral of Dr. Blackburn she and the administrator had gone through the boxes at the bank and he had seen her remove some deeds, and had at her request erased the name of Dr. Blackburn from one of the boxes, and had put hers in its place. He claimed he knew that the stocks and bonds in the Miners' Savings Bank belonged to her, and he gave her to understand that there was no question about it. When they were going up the steps to court the morning he was appointed administrator, she said, "Now, Charley, there is no question about my bonds and stocks at the Miners' Bank, and I can have them?" and he said, "Yes, Mrs. Blackburn, I'll see to it right away"; "but he talked very different after he was appointed. Prior to his appointment he had shown no disposition to sue me or bring my property in question at all; none whatever." Again, touching the real estate: "Charles Blackburn has talked to me and discussed with me my title to the property. He saw all the

papers before he was appointed administrator, and after he was appointed he said, in the presence of my sister, that there was no question of my ownership of the real estate.  *  *  *  I cannot say how many times he made that statement, but he talked that way right along. He stated that more than once. I could tell you specifically the conversation we had about the Gallatin Addition, and it was this: I owed $2,000 on the Gallatin Addition, and the interest was 10 per cent, and I wanted to stop the interest; so I paid my $2,000. Charley was up in the room one day, and I said, 'Now, Charley, I am going to pay my $2,000; as administrator you are not going to present any claim whatever to my Gallatin Addition?' and he said, 'No, Mrs. Blackburn, that is absolutely yours.'  *  *  *  Charles Blackburn testified to the value and nature of the property belonging to the estate at the time he obtained his letters of administration. He at that time, as I remember, said there was no real estate in the estate, and that the property consisted of mining stock, office furniture, and book accounts, and I do not remember any more. *  *  *  He did not mention the Tuolumne stock at the Miners' Bank as belonging to the estate, nor the South Park Mining & Realty Company stock as belonging to the estate, nor the Independent Telephone bonds as belonging to the estate. As I remember it, he stated the value of the estate was from $5,000 to $7,000, or words to that effect—that the estate was not over $7,000. He said there was no real estate. Before he made these declarations under oath he had not only examined the papers of the estate, but he had seen my papers also.  *  *  *  As we came down from Judge Donlan's court I said something about, 'Now, Charley, I will go and get my things,' and you [Mr. Brown] said, 'Oh, Mrs. Blackburn, Charley is under bond now,' and I said, 'Mr. Brown, those things don't belong to the estate; they belong to me.'  *  *  *  What I wanted was my Tuolumne stock. Charley had promised to go over there to the bank as soon as he was appointed.  *  *  *  And this conversation was right after the hearing at which he testified in Mr. Brown's presence that the estate was worth something like

$5,000.'' The deeds which she had removed from the bank boxes in the presence of the administrator ran from her to Dr. Blackburn; these she destroyed, claiming that they had been executed to avoid administration in case of her death, but never delivered. In regard to that she testified that Charles Blackburn knew of her intention to destroy them, before it was done, and both he and Mr. Brown knew of their destruction after it was done, and before the appointment of the administrator. The waiver was signed on March 29, 1912. At that time she did not have, and had not had, any counsel. Concerning this, in response to inquiries by Mr. Brown, she testified: ''You offered your assistance as attorney; otherwise I would have had an attorney to protect me. But Charley brought you to my house, and you offered your services, and I, as a professional man's wife, did not consult any other attorney until Charles Blackburn was appointed administrator, and then I said to you, 'Are you my attorney?' and you did not know about it.''

The testimony of the administrator is as remarkable for what it does not contain as for what it does contain. On direct examination he gave no testimony in denial of the foregoing or concerning his attitude before and after administration, touching her and her claims, except that he had consulted counsel regarding the stocks, bonds, and real estate, and had listed them as the property of the estate on the advice of counsel. He also said: ''I first knew the deeds had been destroyed when the matter was testified to here in court. * * * I can't recall whether Mrs. Blackburn told me she was going to destroy them; my recollection is that she did tell me that her intention was to destroy them.'' On cross-examination he said he could not tell when he first consulted counsel about the real estate, except that it was after his appointment. ''I did not tell him about those deeds in the bank and their removal by Mrs. Blackburn before I petitioned for letters of administration. I knew about those deeds before I petitioned for letters of administration, but did not disclose the fact to my counsel. I don't know why I didn't, but it probably escaped me. I don't know whether I

disclosed that fact to him before I secured letters of adminis-
tration or not.   *   *   *   I testified at the hearing of the appli-
cation for letters of administration   *   *   *   that the estate
did not, to the best of my knowledge, own any real estate.
*   *   *   At that time I knew of those deeds which Mrs. Black-
burn had removed, and had known of them some ten days be-
fore, but began to see the light in regard to this real estate
as soon as I had put the facts up to my counsel.' I cannot say
what date that was, but I am quite sure it was after my appoint-
ment.   *   *   *   I first learned of those bonds being down in
the Miners' Savings Bank before Dr. Blackburn was buried.
*   *   *   I took this matter up with my counsel, and got advice
from him shortly before I was appointed, I think. I am not
sure that I talked that matter over with him about it before my
appointment. I am not positive whether I did or not.   *   *   *
Upon the advice of my counsel, it was true of my own knowl-
edge that this was the property of the estate. It was my own
knowledge that that was property of the estate, and Mrs. Black-
burn was endeavoring to get it for her own use.   *   *   *   I
remember Mr. Brown in my presence, and within a few minutes
after I was appointed administrator, telling Mrs. Blackburn that
those securities had to be turned into the estate. He told Mrs.
Blackburn that standing in front of Judge Lynch's courtroom
on Granite street. That was a few minutes after I was ap-
pointed. At that time Mrs. Blackburn said, 'Well, now, you can
go right down and get my stocks and give them to me, can't
you?' or 'Get my bonds and stuff at the Miners' Savings
Bank,' and Mr. Brown said, 'Why, that stuff must undoubtedly
go through the estate.'   *   *   *   I presume Mrs. Blackburn
addressed the remark, 'Go down and get my bonds or stocks,' to
me. All three of us were there. I had not previously agreed
to do that. In a general way the ownership of the securities
at the Miners' Savings Bank had been discussed between my-
self and Mrs. Blackburn. I did not tell her as late as the morn-
ing of my appointment .that I would go down and get those
things for her as soon as I was appointed. In this general con-

versation that I had about the ownership, I did not agree with her, that she was the owner. I did not say she was not. I took the position that until I had been more fully advised in the premises and had seen the securities, and had had an opportunity to investigate the conditions under which they had been left there, and the physical appearance of them, that it was not up to me to decide as to whose they were. I don't know whether I told her that at any time before I was appointed administrator or not. As to telling the court that when I was under oath, I wasn't asked about it. * * * I consulted with Mr. Maury in regard to this proceeding. He is not my attorney in this case. I have not consulted with him quite as frequently as I have with Mr. Brown. I retained him on behalf of Sister M. Florentia and Daisy I. O'Neill. I do not feel that I am controlling their case. I do not feel that I am their representative. They have not communicated directly with Mr. Maury or Mr. Templeman, to my knowledge. As far as I know, they have communicated with me."

Counsel insist that the zeal of the administrator in getting together all the property of the estate is no fault or ground for removal. Assuredly not, but that is beside the mark. The question is whether the waiver of the widow and her request for his appointment was fairly procured and freely given. We think her testimony shows that it was not, and his serves only to confirm that impression. He received her consent to the administration by him of an estate of a certain character, estimated at not to exceed $5,000 in value, and which did not claim any of the property in dispute; she never did consent that he should administer an estate of a different character, valued at $35,558.07, three-fourths of which consists of property claimed by her as her own. Before his appointment she undoubtedly believed, and had reason to believe, that his attitude toward her claims was not adverse; whether this arose from what he said or failed to say is of no importance. (*Power & Bro.* v. *Turner,* 37 Mont. 521, 97 Pac. 950.) His duty under the circumstances was candor toward her and toward the court; he should have

told her that her claims might have to be questioned, and he should have given the court, in his petition for letters and in his testimony at the hearing thereof, all the information he then had in regard to the matter; instead of this, he evaded to the point of deception, if he did not expressly deceive. Deception cannot be countenanced in matters of this kind. (*Lutz* v. *Mahan*, 80 Md. 233, 30 Atl. 645; *In re Farnham's Estate*, 41 Wash. 570, 84 Pac. 602.) At the time he filed the inventories, at the time he filed his objection to her petition, and at the time he testified on this hearing, no material facts had come to his knowledge which were unknown to him at and before the time he received his appointment as administrator; yet he now questions her widowhood, is certain that none of the property is hers, charges her with endeavoring to convert the property of the estate to her own use, and causes counsel to appear and join in his attack on behalf of the other heirs. His offense is not in listing the property in question, but in the exhibition of an attitude so generally hostile to the widow as to warrant the inference that he had held it before his appointment, but carefully screened it from her until his position should be assured.

It is urged, however, that there was no sufficient allegation in [5] the appellant's "pleading" in the way of excuse or avoidance of her waiver and request. We do not think that in a proceeding of this kind the parties should be held to a strict and technical observance of the rules of pleading. It is sufficient if the administrator was informed, by the allegations of the widow, of the nature and probable scope of her complaint, and that he was so informed is evident from the fact that no surprise was claimed, that he testified concerning the matter so far as interrogated, and that the subject was canvassed without any objection touching the sufficiency of the "pleading."

Some remarks are also made about the discretion of the district court and the willingness of the administrator to have the disputed questions of title settled by an agreed statement of [6] facts. Discretion in the trial court arises only when there is room for it. From the testimony, which presents no substan-

tial conflict, it appears that the widow's renunciation of her right to administer was not fairly procured nor freely given; her prior right has therefore not been exercised. It is not within the power of any court to deny her the exercise of that right. As to the agreed statement of facts, the record does not show what the administrator proposed to agree to; hence we cannot tell whether his willingness to agree is a circumstance in his favor or not.

3. An examination of the record and of the authorities convinces us that the failure of the administrator to include the [7] watch and glasses in his first inventory constituted no ground for his removal. As an impeachment of his integrity it was frivolous; but it illustrates the state of feeling and the lack of confidence on the part of the widow toward her nominee.

We have said above that the widow is not incompetent merely [8] because of her claims to the property in dispute; whether her conduct was such as to establish a want of understanding or integrity so as to render her incompetent we do not decide. But, competent or not, she still has her right of nomination. (*McLean* v. *Roller,* 33 Wash. 166, 73 Pac. 1123; *Stevenson's Estate,* 72 Cal. 164, 13 Pac. 404; *Bedell's Estate, supra.*)

The order appealed from is reversed, with directions to the district court of Silver Bow county to revoke the letters of administration heretofore issued to Charles A. Blackburn, and to grant the petition for the appointment of the appellant, unless the court shall find, from the evidence taken or which may be taken at a further hearing, that she is incompetent for want of proper understanding or integrity, in which event to appoint such competent person as she may nominate.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied December 24, 1913.